IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF DELILAH C. ET AL.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF DELILAH C. ET AL.,
CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

JAELYN C., APPELLANT.


Filed April 26, 2022.   Nos. A-21-723 through A-21-726.


Appeals from the County Court for Scotts Bluff County: JAMES M. WORDEN, Judge. Affirmed.

William E. Madelung, of Madelung Law Office, P.C., L.L.O., for appellant.

Travis R. Rodak, Deputy Scotts Bluff County Attorney, for appellee.

Jean Rhodes, guardian ad litem.


MOORE, RIEDMANN, and ARTERBURN, Judges.

MOORE, Judge.

## I. INTRODUCTION

Jaelyn C. appeals from the order of the Scotts Bluff County Court, sitting in its capacity as a juvenile court, terminating her parental rights to her minor children. The court found that termination of Jaelyn's parental rights was proper under Neb. Rev. Stat. § 43-292(2), (6), and (9) (Reissue 2016) and that termination of her parental rights was in the children's best interests. The court also found, as required by the Nebraska Indian Child Welfare Act (NICWA), Neb. Rev. Stat. §§ 43-1501 to 43-1517 (Reissue 2016), that active efforts had been made to prevent the breakup

- 1 -

of the Indian family, which proved unsuccessful, and that the continued custody of the children by Jaelyn was likely to result in serious emotional or physical damage to them. Following our de novo review of the record, we affirm.

## II. STATEMENT OF FACTS

### 1. PETITIONS AND ADJUDICATION

Jaelyn is the mother of Danyka C., born in February 2013; Demayah C., born in February 2015; Delilah C, born in January 2017; and Isabella C., born in September 2019. In April 2021, Jaelyn gave birth to another child, who was privately adopted and is not part of this case. David B. is the biological father of Danyka; Lukas C. is the biological father of Delilah and Demayah; Matthew A. is the biological father of Isabella. None of the fathers are involved in the present appeal, and we reference them further only as necessary.

Jaelyn and her children have been the subject of one previous juvenile court case, open from January through May 2020, and numerous Nebraska Department of Health and Human Services (the Department) intakes dating back to 2013, many of which involved allegations of domestic violence against Jaelyn and the children by Jaelyn's various domestic partners. In connection with the present case, the children were removed from Jaelyn's care on September 17, 2020, and they have remained in out-of-home placement since that time. The children were previously in a familial out-of-home placement from January through May 2020 in connection with a prior juvenile court case, followed by a return to Jaelyn's care when that case closed. Upon their removal in this case, they had two additional familial out-of-home placements, followed by several respite and non-familial foster care placements through the time of the termination hearing in this case.

On September 17, 2020, the State filed petitions in the juvenile court, alleging that Danyka, Demayah, Delilah, and Isabella were children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because they lacked proper parental care by reason of the fault or habits of Jaelyn. Specifically, the State alleged that Jaelyn had a lengthy history of being in domestically violent relationships, placing the children at risk of harm or depriving them of necessary parental care; that the children lacked safe and stable housing; that their fathers failed to provide them with necessary parental protection, support or care; and that a prior "3a case" in Box Butte County closed in May 2020 and the services provided in that case had failed to correct "the issues." The State also alleged that NICWA was applicable because the children were of Native American heritage. That same day, the court entered orders placing the children in the Department's temporary custody.

The juvenile court entered orders adjudicating the children as juveniles within the meaning of § 43-247(3)(a) on November 4, 2020.

### 2. DISPOSITION

A dispositional hearing was held before the juvenile court on November 30, 2020. The court adopted the Department case plan offered at the hearing and continued the children's out-of-home placement. The court ordered Jaelyn to complete a parenting capacity evaluation.

The case plan goals for Jaelyn have remained the same throughout this case. First, Jaelyn was to provide a safe and stable home; provide appropriate parenting as evidenced by

age-appropriate supervision of the children at all times; and provide for the children's basic, medical, and educational needs. To achieve this goal, Jaelyn was to work with providers and informal supports to find and keep steady employment, attend individual counseling, complete the "Circle of Security" class, participate in supervised parenting time, utilize community resources as needed for housing assistance, and obtain and maintain safe and appropriate housing. The second goal of Jaelyn's case plan was to have a plan to keep herself and the children safe as evidenced by not letting dangerous or inappropriate people in the home and by her reaching out to appropriate resources regarding her safety, including law enforcement when appropriate. To achieve this goal, Jaelyn was to continue working with "DOVES," only allow appropriate people around the children, identify healthy supports and reach out to them when needed, and contact law enforcement and her support system as appropriate when she was feeling unsafe.

Following review hearings in March and June 2021, the juvenile court continued the children's out-of-home placement. After the June hearing, the court added a concurrent permanency goal of adoption to the prior permanency goal of reunification.

### 3. TERMINATION

#### (a) Motions

On May 27, 2021, the State filed motions to terminate Jaelyn's parental rights to the children. The State alleged that termination of Jaelyn's parental rights was appropriate under § 43-292(2), (6), and (9), that termination of her parental rights was in the children's best interests, and that the children were of Native American heritage and subject to NICWA.

On July 26, 2021, the State filed motions to terminate Jaelyn's visitation.

#### (b) Termination Hearing

A termination hearing was held before the juvenile court on August 2, 2021. The State presented testimony from several Department case workers, a family support and visitation worker, and the therapists for Jaelyn and the children. The State also offered various documentary exhibits, including the deposition of a NICWA expert, which the court received into evidence. And, Jaelyn testified on her own behalf.

##### (i) Prior Department Intakes

Department case workers testified about Jaelyn's long history of Department intakes, beginning in 2013. The Department has three levels of priority for its intakes, with level one being the highest priority and generating the quickest response. A 2013 intake involved allegations that Danyka was dropped and developed a seizure disorder, that Jaelyn left with Danyka and did not have Danyka's seizure medication, as well as allegations of a dirty home. An intake in 2015, alleged that Danyka had been without her seizure medication for 7 months and that Jaelyn was pregnant and not receiving prenatal care. There were also concerns of domestic violence at the time; Lukas was in prison due to a domestic violence situation against Jaelyn and for having assaulted an officer. A priority two intake in 2016, alleged that Demayah was wandering outside of the home and also included allegations of little food in the home and a cockroach infestation. A priority one intake in 2017, involved allegations of Danyka's health being seriously compromised

due to lack of her seizure medication and that Jaelyn had little understanding of her children's medical needs.

There were five priority one intakes in 2019 involving progressively worsening acts of physical violence against Jaelyn and the children by Moises G., whom Jaelyn married in June. The 2019 intakes included a threat by Moises to kill one of the children, his taking the family to Mexico in October, and Jaelyn and children fleeing from Mexico back to the United States after Moises severely beat Jaelyn and one or more of the children and attempted to drown at least one of them. In January 2020, juvenile court cases involving the children were initiated in Box Butte County based on the allegations of the 2019 intakes, and the concern that Moises, who had been incarcerated in Mexico, would return to the U.S. The Box Butte County cases were dismissed in May without an adjudication. The reason for those dismissals is not clear from our record, though discussion between counsel for the State and the judge at the close of the termination hearing in this case suggests that the Box Butte County cases were closed because Jaelyn had obtained a protection order against Moises. As noted further below, however, the only protection order proceedings by Jaelyn against Moises, documented in our record, were dismissed for lack of jurisdiction. Regardless, the record shows that the Box Butte County juvenile cases were closed and that shortly thereafter, Jaelyn stopped utilizing all services, including counseling for herself and the children, and moved to Scottsbluff with her boyfriend, Jack W. Two additional Department intakes received in September 2020, involved domestic violence by Jack. Jaelyn agreed to voluntary services after the first 2020 intake, but shortly thereafter, Jack was arrested for strangling Jaelyn while some of the children were present, which prompted the second intake and led to the initiation of the present case in Scotts Bluff County.

*(ii) Evidence About Jaelyn's Domestic Partners*

There was evidence about the criminal histories and other legal matters involving the fathers and Jaelyn's other domestic partners. The current Department case worker testified that Lukas has had "three criminal charges on [Jaelyn]," and that subsequently, he has had "multiple domestic assault charges on his current significant other." Exhibit 21 received into evidence shows Lukas' plea-based conviction for third degree assault against Jaelyn (a child abuse charge was dropped) and his sentence to probation. Following a probation violation, he was later fined $900 and sentenced to 7 days in jail.

The current case worker testified that Matthew has had two criminal charges for assault against Jaelyn. Exhibit 22 showed Matthew's plea-based conviction for attempted strangulation and 3rd degree domestic assault against Jaelyn (a child abuse charge was dropped). He was initially sentenced to probation, but he was later sentenced to consecutive terms of 12 months' and 6 months' incarceration, respectively. Another exhibit shows that Jaelyn obtained a domestic abuse protection order in March 2019 against Lukas, protecting herself and the oldest three children.

The record contains documents from divorce proceedings initiated by Jaelyn against Moises in the district court for Box Butte County in July 2020, showing that they were married in June 2019 and that their marriage was dissolved in October 2020. According to the current case worker, Moises "had three criminal charges for assault on Jaelyn and the children." Jaelyn sought a protection order in the district court for Box Butte County against Moises on behalf of herself and the children based on his physical abuse of them while they were in Mexico in November

2019. The district court dismissed Jaelyn's petition without a hearing for lack of jurisdiction because the alleged events happened in another country.

At the time the current juvenile court case was initiated, Jaelyn was involved with Jack. In looking at Jack's criminal history, the current case worker found that he "has one charge for assault against [Jaelyn] when this case opened, but he has two other assault charges on his history." Jaelyn obtained a domestic abuse protection order against Jack on her own behalf from the district court for Scotts Bluff County in September 2020.

By October 2020, Jaelyn reported dating another individual. A criminal check of that person's background did not reveal any assault charges, but he had a charge of contributing to the delinquency of a child (Jaelyn also has this charge and was with him at the time) and a couple of possession charges (one of which Jaelyn was present for). The case worker was unaware of Jaelyn having any other "contacts with law enforcement" beyond those two instances referenced in connection with this individual.

### (iii) Children's Therapy

The children's therapist, Lori Rodriguez-Fletcher, testified about the physical and emotional trauma and abuse experienced by the children. The children's diagnoses and symptoms include physical child abuse, posttraumatic stress disorder, ADHD, seizure disorder, nightmares, hypervigilance, mood swings, loss of role (acting like a parent), brain bleed, history of repeated domestic violence exposure, sexualized behavior, aggression, delayed speech, and attachment disorder. In commenting on Danyka's hypervigilance and fear when first starting treatment, Rodriquez-Fletcher noted that both Danyka and Demayah would walk to her office "with sticks in case somebody tried to hurt them."

Rodriquez-Fletcher spoke with Jaelynn about the abuse her family has experienced at some point prior to the dismissal of the Box Butte County cases. According to Rodriquez-Fletcher, during their one-on-one meeting, Jaelyn did not express a level of insight into the children's trauma sufficient to promote the children's healing. Rodriquez-Fletcher noted Jaelyn's own "very extensive trauma history" and stated that Jaelyn would discuss the family's trauma "almost in kind of a dissociative state in which there's really not a connection." For example, Jaelyn stated "we were waterboarded . . . just like that, with really no emotion surrounding it." Rodriquez-Fletcher felt that Jaelyn's struggle with healthy relationships "makes her not a safe person because the kids have gone from traumatic relationship to traumatic relationship." She indicated that Jaelyn needed to work through her own trauma before she would be in a position to help the children heal. Rodriquez-Fletcher also testified about the children's attachment issues and indicated that the children will all need long term therapy, consistency, structure, and a protective caregiver.

### (iv) Jaelyn's Therapy

Jaelyn attended a limited number of counseling sessions with therapist Jamie Erdman, following Jaelyn's intake and initial diagnostic interview in January 2021, which was completed by Erdman's supervisor. Jaelyn was diagnosed with "PTSD with derealization and major depressive disorder with rule out of generalized anxiety order." Erdman testified that "derealization is when [people] have feelings of unreality" and that "people describe it as if they've stepped outside their body and they're just kind of watching what's happening around them

without being a part of it." According to Erdman, this coping mechanism or "survival skill" is something the brain provides as "a way of disconnecting us from trauma so that we can get through it," but if "left unchecked," can cause people to also dissociate from other daily activities. Erdman developed a treatment plan with Jaelyn, and they had 10 therapy sessions scheduled. Jaelyn attended six sessions and missed the remaining four sessions. Erdman discharged Jaelyn on May 4, 2021. Jaelyn returned on June 4 and requested another intake, and although they planned at that point to simply continue the previous treatment plan, Jaelyn has not seen Erdman since. During their relationship, Erdman was never able to address the PTSD and other trauma-related symptoms that brought Jaelyn to therapy.

### (v) Visitation and Family Support Services

Jaelyn was to employ age-appropriate parenting in supervised visits with the children, but she had difficulty with this goal. Concerns during her visits included her using her phone too much, forgetting to bring diapers and appropriate food and drinks, and yelling and cussing at the children. When redirected by visitation workers, Jaelyn sometimes expressed frustration and was resistant to their instruction. Jaelyn only attended about 40 percent of her scheduled visits, and she was not consistent in engaging with the children during the visits that she did attend. Similarly, Jaelyn was inconsistent in utilizing the family support services offered to her. The visitation and support provider performed "sweat patch" drug testing of Jaelyn from the end of March 2021 through the time of the termination trial, and all of the weekly tests yielded positive results for THC (which Jaelyn attributed to her use of "an oil" given to her by her aunt).

### (vi) Other Case Plan Requirements

According to the family's current Department case worker, Jaelyn's progress toward completing her case plan goals has been "minimal." In addition to Jaelyn's inconsistency in participating in visitation and individual counseling discussed above, she has started and quit multiple jobs, did not work with "DOVES," has not had consistent housing, and did not complete the Circle of Security parenting class. Jaelyn left a women's trauma group at break and never returned. She does not have any positive supports in the community. The juvenile court ordered a parental capacity evaluation in November 2020. Jaelyn did not show up for at least four appointments that were scheduled for the evaluation, and it was never completed. Jaelyn was inconsistent in attending the monthly family team meetings held by the case worker. The current case worker did not feel that Jaelyn had a lot of insight into why the children are not in her care, and she testified that the children have shown no interest in being reunited with Jaelyn. The case worker's concerns as of the time of her testimony were Jaelyn's age-appropriate parenting, the history of domestic violence, and Jaelyn being able to provide for the children with employment and housing. She opined that termination of Jaelyn's parental rights was in the children's best interests due to the lack of progress and "the continued concerns." She noted, in particular, the trauma experienced by the children, their difficulty in forming attachments, and their need for stability and consistency. She did not feel that Jaelyn was able to show the children that they were a priority and to care for them appropriately "now or in the foreseeable future."

### (vii) NICWA Expert

The State offered the deposition testimony of Cassie Benitez, an expert witness as required by NICWA who reviewed records and documents in the present case. She noted the Department's provision of case management, family team meetings, supervised visitation, family support, peer support, vouchers and other financial aids, counseling, relative placement, and efforts to identify culturally compliant services, among other efforts. Benitez testified that the Department had made active efforts to prevent the breakup of the family, which had been unsuccessful based on Jaelyn's unwillingness to participate in the services offered. Benitez also testified that it would not be safe for the children if they were returned to the care and custody of "any of their parents" due to the "extreme safety issues and inconsistency in the parents being able to provide a safe and secure environment for their children." She opined that the children would be at risk of serious emotional or physical harm if returned home because the children were still working through the past trauma they experienced in the home environment and because "right now nothing has been done" to ensure that they would be safe if returned to the home environment.

### (viii) Jaelynn's Testimony

During her testimony, Jaelyn indicated that she was not currently working and that her job as a "CNA" and "restorative aide" at a nursing home was "on hold" until she "finish[ed] up with [the Department]." Jaelyn indicated that she was homeless and living in her car from January through July 23, 2021. She had just moved into a new apartment shortly before the termination hearing. When asked about her ability to pay for this housing, Jaelyn testified that "[w]e have three months of rent paid" and that she hoped to "take over the utilities and everything" in October, at which point she hoped to be "back at the nursing home." She denied having any current involvement with any of her previous domestic partners. She was asked about the drug testing results and testified that she had been using a cream "that was just supposed to have CBD in it" to help with back and knee pain. She testified, however, that she "immediately" stopped using the cream once she was told that she would be tested for drugs. She testified about her pregnancy during the course of this case and the emotional effects of giving that baby up for adoption. Jaelyn testified that she would like for the children at issue in this case to be returned to her and that termination of her parental rights was not in their best interests because "we can work together with therapy and healing together."

### (ix) Court's Ruling

At the conclusion of the hearing, the juvenile court announced that it was terminating Jaelyn's parental rights, with a written order to follow. The court also canceled Jaelyn's visitation with the children, and ordered that the children's current therapist remain their therapist as long as possible and until transfer to another therapist could take place.

### (c) Termination Order

In its thorough written termination order, entered on August 18, 2021, the juvenile court reviewed the evidence offered at the hearing, noting the "shocking" domestic violence occurring over approximately a decade, the "horrific trauma" endured by the children, and Jaelyn's failure to make "any significant progress" in this case. The court found clear and convincing evidence

that the State had provided active efforts to prevent the breakup of the Indian family and to reunify the children with Jaelyn, which active efforts had failed. The court also found evidence beyond a reasonable doubt, supported by the testimony of a qualified NICWA expert, that placement of the children with Jaelyn was likely to result in serious emotional or physical damage to the children. Finally, the court found clear and convincing evidence that termination of Jaelyn's parental rights to the children was proper under § 43-292(2), (6), and (9) and that termination of her parental rights was in the children's best interests.

## III. ASSIGNMENTS OF ERROR

Jaelyn asserts that the State did not establish by clear and convincing evidence that (1) one or more of the statutory grounds for termination have been satisfied and (2) termination of her parental rights is in the children's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). When the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## V. ANALYSIS

To terminate parental rights, it is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Mateo L., supra*. Clear and convincing evidence means that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of Zachary D. & Alexander D.*, 289 Neb. 763, 857 N.W.2d 323 (2015).

The Nebraska Indian Child Welfare Act adds two additional elements the State must prove before terminating parental rights in cases involving Indian children. *In re Interest of Audrey T.*, 26 Neb. App. 822, 924 N.W.2d 72 (2019). First, the State must prove by clear and convincing evidence that active efforts have been made to prevent the breakup of the Indian family and that these efforts have proved unsuccessful. *Id.* See § 43-1505(4). Second, the State must prove by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. *In re Interest of Audrey T., supra*. See § 43-1505(6).

### 1. STATUTORY GROUNDS

Jaelyn asserts that the State did not establish by clear and convincing evidence that one or more of the statutory grounds for termination have been satisfied. In this case, the juvenile court found clear and convincing evidence of statutory grounds to terminate Jaelyn's parental rights to the children under § 43-292(2), (6), and (9). Upon our de novo review, we find that the State presented clear and convincing evidence to support termination of Jaelyn's parental rights under § 43-292(2). Proof of one statutory ground is needed for termination, and the record clearly shows that statutory grounds for termination of her parental rights exist under § 43-292(2).

Section 43-292 (2) requires proof that "[t]he parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection." The questions of what constitutes neglect and necessary parental care and protection are generally determined on a case-by-case basis, but common factual patterns include parental incarceration, adjudication, involuntary termination, or relinquishment of previous children, unsanitary house and unkempt children, or addiction to drugs or alcohol. See *In re Interest of Elijah P. et al.*, 24 Neb. App. 521, 891 N.W.2d 330 (2017). One need not have physical possession of a child to demonstrate the existence of neglect contemplated by § 43-292(2). *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). A parent's failure to provide an environment to which his or her children can return can establish substantial, continual, and repeated neglect. *Id.* Past neglect, along with facts relating to current family circumstances which go to best interests, are all properly considered in a parental rights termination case under § 43-292(2). *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

At trial, the State showed that Jaelyn has done little to take advantage of the numerous services provided to her and has made minimal progress toward her case plan goals. Jaelyn has failed to put herself in a position to acquire possession of the children, who were placed in the Department's custody primarily due to the ongoing violence in Jaelyn's domestic relationships. During the course of this case, Jaelyn has been provided with resources to address the domestic violence of which she and the children have been victims. However, Jaelyn has not engaged with the resources provided to her in such a way as to be any closer to having the children returned to her care than she was at the point when the children were removed from her care at the start of this case. She has not engaged in the individual therapy needed to address her own personal trauma, a necessary step prior to her being able to help the children heal from their own trauma. She has not maintained consistent housing or employment. And her engagement in supervised visitation has been inconsistent both in terms of her attendance and her parenting during the visits she actually attended. The record shows clear and convincing evidence of neglect under § 43-292(2).

The juvenile court also found sufficient evidence to support termination under § 43-292(6) and (9). We note that Jaelyn inexplicably argues that termination was improper under § 43-292(3), which was not an allegation of the State's petition, and that while she presents arguments that termination was improper under § 43-292(9), she does not present any arguments that termination was improper under § 43-292(6). To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *In re Interest of Joezia P.*, 30 Neb. App. 281, 968 N.W.2d 101 (2021). We do not need to consider whether termination of Jaelyn's parental rights was proper pursuant to the other statutory grounds found by the court, regardless of Jaelyn's arguments about those grounds, or lack thereof. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for termination of parental rights when coupled with the evidence that termination is in the best interests of the child. *In re Interest of Brelynn E.*, 30 Neb. App. 723, ___ N.W.2d ___ (2022). Because we conclude that the State presented clear and convincing evidence that grounds to terminate existed under § 43-292(2), we need not address the other statutory grounds.

## 2. Best Interests and Unfitness

Jaelyn asserts that the juvenile court erred in finding that termination of her parental rights is in the children's best interests. She argues that she proved a close and loving relationship with her children and notes her testimony that termination of her parental rights was not in the children's best interests, that she had found housing, and that she had ended contact with the various men who had abused her and the children. She argues that this "progress as to housing and relationships would warrant continuing the mother-child relationship." Brief for appellant at 10.

In addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016). And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.*

The evidence shows that Jaelyn made minimal efforts to comply with the case plan developed by the Department. Clearly, Jaelyn has suffered significant emotional and physical trauma, as have the children. Jaelyn's efforts to focus on her case plan goals were undoubtedly complicated by her pregnancy and the subsequent private adoption of her fifth child, as well as the necessity to navigate accessing certain services during the COVID-19 pandemic. However, the children have a long course of therapy ahead to recover from their trauma and Jaelyn has done nothing to address her own trauma. Jaelyn has clearly not placed herself in a position to have the children returned to her care. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). We conclude that the State showed by clear and convincing evidence that Jaelyn was unfit and that termination of her parental rights was in the children's best interests.

## 3. Additional NICWA Requirements

Jaelyn did not separately assign that the juvenile court erred in finding that there was clear and convincing evidence that active efforts have been made to prevent the breakup of the Indian family and that those efforts proved unsuccessful. Nor did she separately assign error to the court's finding that there was evidence beyond a reasonable doubt that continued custody by Jaelyn would result in serious emotional or physical damage to the children. However, for the sake of

completeness, we have briefly addressed these findings, and our de novo review of the record shows that the court did not err in this regard.

The "active efforts" standard under § 43-1505(4) requires more than the "reasonable efforts" standard that applies in cases involving non-Indian children, and it requires a case-by-case analysis. See *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2008). To constitute "active efforts" under § 43-1505(4), at least some efforts should be "culturally relevant." *In re Interest of Walter W., supra*. Upon our de novo review, we find that the State presented sufficient evidence demonstrating that active efforts were made to prevent the breakup of Jaelyn and the children and that these efforts were unsuccessful. Likewise, the record contains qualified expert testimony that proves beyond a reasonable doubt that continued custody of the children by Jaelyn would result in in serious emotional or physical damage. The requirements of NICWA were satisfied.

## VI. CONCLUSION

For the reasons stated above, we affirm the juvenile court's order terminating Jaelyn's parental rights to her minor children.

AFFIRMED.